**818**

WM. FLEMING AND BESSIE M. FLEMING, HUSBAND AND WIFE, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 46713, 46781, 46782. Filed July 29, 1955.

*Harry C. Weeks, Esq.*, for the petitioners.
*Daniel A. Taylor, Esq.*, for the respondent.

### OPINION.

JOHNSON, *Judge:* Respondent determined deficiencies in income tax as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 46713 | Wm. Fleming and Bessie M. Fleming | 1948 | $94, 113. 30 |
| 46781 | F. Howard Walsh and Mary D. Walsh | 1948 | 2, 301. 31 |
| | | 1949 | 38, 550. 52 |
| 46782 | Mary D. Fleming Walsh | Fiscal year ended 8/31/48 | 51, 976. 17 |
| | | Fiscal year ended 8/31/49 | 31, 218. 55 |

The issues presented are:

(1) Whether an exchange of limited overriding royalties or oil payment interests for the fee simple title to a ranch was an exchange solely in kind under section 112 (b) (1), Internal Revenue Code of 1939. In the alternative, if a gain is recognized, is it a capital gain, or ordinary income with depletion allowable?

(2) Would the tax consequences resulting from the exchange above be different where urban real property is substituted for the ranch?

(3) Did petitioners F. Howard Walsh and Mary D. Walsh receive taxable income in 1948 and 1949 because of certain transactions involving endowment life insurance policies?

Petitioner Mary D. Fleming Walsh has stipulated that she is liable as a transferee for whatever deficiencies in income tax are finally

---

[1] The following proceedings are consolidated herewith: F. Howard Walsh and Mary D. Walsh (husband and wife), Docket No. 46781; Mary D. Fleming Walsh, Docket No. 46782.

determined against Wm. Fleming, Trustee, for the fiscal years ended August 31, 1948, and August 31, 1949.

All of the facts have been stipulated and are so found and we summarize therefrom as follows:

Wm. Fleming and Bessie M. Fleming were husband and wife, as were F. Howard Walsh and Mary D. Walsh. Mary D. Fleming Walsh (Mary D. Walsh) was also the daughter of Wm. Fleming. All petitioners were residents of Fort Worth, Texas, and their income tax returns were filed on a cash basis with the collector of internal revenue for the second district of Texas.

## Issue I.

For all the years before us Wm. Fleming was the sole trustee and Mary D. Walsh was the sole beneficiary of the private trust known as Wm. Fleming, Trustee. This trust was created in 1931 and continued in existence until 1950. The trust kept its books on a cash basis for a fiscal period ending August 31 of each year, and its income tax returns were filed with the collector of internal revenue for the second district of Texas.

For the years before us the Fleming Oil Company was a partnership composed of Wm. Fleming and Wm. Fleming, Trustee. The partnership produced oil and gas, and made investments. Wm. Fleming held a 61.026 per cent interest in the business, and Wm. Fleming, Trustee, a 38.974 per cent interest. Partnership books were kept on a cash basis, and tax returns for the partnership were filed with the collector of internal revenue for the second district of Texas.

On May 19, 1948, Marie Hildreth Cline (joined by her husband) conveyed an undivided fee simple title to 2,994.5 acres of ranch land to the Fleming Oil Company (50 per cent), Wm. Fleming, Trustee (25 per cent), and Wm. Fleming (25 per cent). As consideration for this conveyance the grantees of the land conveyed and assigned to Marie Hildreth Cline certain limited overriding royalties or oil payment interests. These limited overriding royalties or oil payment interests came from oil and gas leases, or oil and gas mineral leases, which the transferors had owned for more than 6 months prior to May 19, 1948, for productive use in their respective trades and businesses and not for sale. The ranch was acquired for investment and not for sale.

Pertinent parts of the various oil payments to Marie Hildreth Cline are presented below:

In the first, the Fleming Oil Company, as owner of one-half of seven-eighths of certain oil and gas leasehold estates

does hereby sell, assign, and convey unto the said MRS. MARIE HILDRETH CLINE, as a part of her separate property and estate, her heirs and assigns, the following described real property, to-wit:

An overriding royalty and mineral interest carved hereby out of the interest owned by Fleming Oil Company in each and all of the oil and gas leases described above, amounting to an undivided 49/128ths interest in and to all the oil in, under, and that may be produced, saved and marketed from the above described tracts of land under the terms of the oil and gas leases covering same, until the grantee named above shall have received therefrom oil of the net value of One Hundred Forty-seven Thousand Dollars ($147,-000.00), plus an amount equal to five per cent (5%) interest per annum from May 19, 1948, on the portions of said $147,000.00 which may be unsatisfied from time to time.

This grant was made subject to certain conditions, limitations, and agreements, such as:

(1) No interest in the gas or casinghead gas in, under, or produced and saved from said tracts, and no interest in the personal property now or hereafter placed thereon is assigned or conveyed to grantee, this conveyance affecting the oil only.

\* \* \* \* \* \* \*

(5) When and if the grantee herein, her heirs and assigns, have received from the fractional interest hereby assigned, oil of the net value of $147,000.00, plus an amount equal to five per cent (5%) interest as above provided, then the interest hereby conveyed to said grantee shall cease and terminate, and said interest shall revert to, and shall thereafter be owned by grantor, its successors, heirs or assigns; and grantee, her heirs and assigns, shall have no further interest in said oil and gas leasehold estates covering said land, or in the oil thereunder; and grantee, her heirs or assigns, shall, upon request, execute such instruments as may be necessary or proper to evidence this of record.

(6) The execution of this conveyance shall not impose upon grantor any obligation with respect to developing or operating the property covered hereby, nor shall it be implied herefrom that grantor is in anywise obligated to see that grantee receives oil aggregating the net value of $147,000.00, plus an amount equal to five per cent (5%) interest as above provided, or any lesser sum; but grantor does covenant and agree that grantee shall have the same but no greater right to require grantor to develop and operate said property in accordance with the terms of the original leases upon said property as the original lessors therein, their heirs or assigns, might have or exercise.

Marie Hildreth Cline's share of oil produced from the property described in the Fleming Oil Company assignment, from the effective date of the assignment to the close of 1952, amounted to:

| Year | Amount |
|---|---|
| 1948 | $15,801.16 |
| 1949 | 22,835.94 |
| 1950 | 31,172.41 |
| 1951 | 31,350.19 |
| 1952 | 30,559.54 |

In the next oil payment, Wm. Fleming, as owner of an undivided interest in certain oil and gas leases

does hereby sell, assign, and convey unto the said MRS. MARIE HILDRETH CLINE, as a part of her separate property and estate, and to her heirs and assigns, the following described real property, to-wit:

An overriding royalty and mineral interest carved hereby out of the interest owned by Wm. Fleming in each and all of the oil and gas leases described above,

amounting to a .166668 interest in and to all the oil in, under, and that may be produced, saved and marketed from the above described tracts of land under the terms of the oil and gas leases covering same, until the grantee named above shall have received therefrom oil of the net value of Seventy-three Thousand Five Hundred Dollars ($73,500.00), plus an amount equal to five per cent (5%) interest per annum from May 19, 1948, on the portions of said $73,500.00 which may be unsatisfied from time to time.

This grant was also made subject to certain conditions, limitations, and agreements. These were similar to those in the Fleming Oil Company assignment. Marie Hildreth Cline's share of oil produced from this property, from the effective date of the assignment to the close of 1952, amounted to:

| Year | Amount |
|------|--------|
| 1948 | $5,423.49 |
| 1949 | 9,412.84 |
| 1950 | 7,916.69 |
| 1951 | 4,854.74 |
| 1952 | 6,420.78 |

The oil payment from Wm. Fleming, Trustee, conveyed to Marie Hildreth Cline the following described interest:

An overriding royalty and mineral interest carved hereby out of the interest owned by Wm. Fleming, Trustee, in each and all of the oil and gas leases described above, amounting to an undivided 6/100ths interest in and to 7/8ths of all the oil in, under, and that may be produced, saved and marketed from the above described tract of land under the terms of the oil and gas leases covering same, until the grantee named above shall have received therefrom oil of the net value of Forty-nine Thousand Dollars ($49,000.00), plus an amount equal to five per cent (5%) interest per annum from May 19, 1948, on the portions of said $49,000.00 which may be unsatisfied from time to time.

Like the other grants, this was also subject to certain conditions, limitations, and agreements. Marie Hildreth Cline's share of the oil produced from this property, from the effective date of the assignment to the close of 1952, amounted to:

| Year | Amount |
|------|--------|
| 1948 | $4,436.99 |
| 1949 | 7,365.73 |
| 1950 | 7,423.68 |
| 1951 | 7,793.11 |
| 1952 | 7,730.24 |

Wm. Fleming, Trustee, also conveyed by a mineral deed certain royalty interests to Marie Hildreth Cline as part consideration for the ranch. In this deed the trust did "grant, sell, and convey unto the said grantee, as a part of her separate property and estate, un [sic] undivided 32.3535/400ths royalty interest in and to all of the oil in, under, and that may be produced from" certain real property. The deed further provided:

Said land being now under an oil and gas lease, it is understood and agreed that this sale is made subject to the terms of said lease, but covers and includes 32.3535/400ths of the 1/8th royalty on oil due and to be paid under the terms of said lease, insofar as it covers the above described land, until the grantee named above shall have received oil of the net value of Twenty-four Thousand Five Hundred Dollars (24,500.00), plus an amount equal to five per cent (5%) interest per annum from May 19, 1948, on the portions of said $24,500.00 which may be unsatisfied from time to time.

Like the other grants, this was also made subject to certain conditions, limitations, and agreements. Marie Hildreth Cline's share of the oil produced from this property, from the effective date of the conveyance to the close of 1952, amounted to:

| Year | Amount |
|---|---|
| 1948 | $2,306.57 |
| 1949 | 3,393.20 |
| 1950 | 3,913.38 |
| 1951 | 3,985.71 |
| 1952 | 3,248.27 |

On the tax returns of Wm. and Bessie M. Fleming and the Fleming Oil Company (a partnership), for the calendar year 1948, and Wm. Fleming, Trustee, for the fiscal year ended August 31, 1948, the exchange of the ranch for the oil payments was treated as an exchange of property of like kind under section 112 (b) (1). However, respondent determined that they received a gain from this exchange and adjusted their 1948 income accordingly. Respondent explained this adjustment to Wm. and Bessie M. Fleming's 1948 net income as follows:

(d) Your gain on the exchange of an oil payment, face amount $73,500.00, plus 5% interest payable out of 40% of 41.667 W. I. in State (Choate) Lease, Eddy County, New Mexico, for a ¼ undivided interest in 2,994½ acres in Parker and Tarrant Counties, Texas, has been computed as follows:

| | |
|---|---|
| Consideration, fair market value of land received, held to be face value of oil payments— ¼ of $294,000 | $73,500.00 |
| Cost basis of oil payment assigned, depletion, 27½% of $73,500 | 20,212.50 |
| Income increased | $53,287.50 |

Respondent's determination, tabulated for each of the assignors, is as follows:

| | Fleming Oil Co. | Wm. Fleming | Wm. Fleming, Trustee |
|---|---|---|---|
| Fair market value of interest in Cline ranch received | $147,000.00 | $73,500.00 | $73,500.00 |
| Net cost or basis of property transferred | 1,102.70 | | 18,119.21 |
| Percentage depletion allowable to | 40,425.00 | 20,212.50 | 20,212.50 |
| Net income from exchange received | 106,575.00 | 53,287.50 | 53,287.50 |

Since the Fleming Oil Company was a partnership, in the final adjustment respondent distributed the partnership income to the partners; the beneficiary's income from the trust was also adjusted.

The exchanges by Fleming Oil Company, Wm. Fleming, and Wm. Fleming, Trustee, of oil payments out of oil and gas leases situated in the counties of Howard, Gregg, and Cooke in the State of Texas and Eddy County, New Mexico, for fee simple title to 2,994½ acres of ranch lands situated in Parker and Tarrant Counties, Texas, were not exchanges of property for property of a like kind and the gain derived therefrom was capital gain.

In this first issue the question is whether the exchange here of limited overriding royalties or oil payment interests for the fee simple title to ranch land was an exchange of "property of a like kind" within the meaning of section 112 (b) (1), Internal Revenue Code of 1939.[2] If so, petitioners' gain therefrom should not have been recognized in computing their taxable income, since the parties admit the existence of the other requirements of the section. Petitioners contend the properties were of like kind, while respondent determined that they were not.

Treasury Regulations, in defining the meaning of "like kind" as here used, state that same "have reference to the nature or character of the property and not to its grade or quality. One kind or class of property may not, under such section, be exchanged for property of a different kind or class." The meaning of the words is there further particularized by citing examples of nontaxable exchanges, which include exchange of "city real estate for a farm or ranch, or a leasehold of a fee with 30 years or more to run for real estate, or improved real estate for unimproved real estate." See Regs. 111, sec. 29.112 (b) (1)–1.

Similar interpretations have appeared in all of the regulations, beginning with Regulations 62, issued under the Revenue Act of 1921. These have all likewise interpreted the term "like kind," and the statute in question has been repeatedly reenacted by Congress without change since the Revenue Act of 1924. "Under the established rule Congress must be taken to have approved the administrative construction and thereby to have given it the force of law." *Helvering* v. *R. J. Reynolds Tobacco Co.*, 306 U. S. 110. This regulation has also been uniformly followed and approved by the courts.

Applying the above regulation to the facts here, we do not think the properties in question have the same "nature or character," nor are they of the same "kind or class," hence they are not "of a like kind" within the meaning of the statute.

In comparing properties to determine their likeness within the meaning of section 112 (b) (1), we must consider not alone the nature

---

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

  (b) EXCHANGES SOLELY IN KIND.—

    (1) PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment * * * is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

and character of the physical properties, but also the nature and character of the title conveyed or the rights of the parties therein. The accepted legal definition of "property" so contemplates and requires. We quote:

In law it is not the physical, material object alone which constitutes "property." The term means something more than the mere thing which a person owns. * * * [73 C. J. S. 138]

The word "property" means not only the thing possessed, that is the physical, corporeal thing, but also *rights* in the physical, corporeal thing which are created and sanctioned by law. [73 C. J. S. 140; *Texas Co.* v. *Hauptman*, 91 F. 2d 449 and other cases there cited.]

The rights created in the property determine the character of the property owned.

The above-cited regulation gives recognition to this legal definition of property. In effect it provides that even if both properties exchanged are realty, if there be substantial difference in the rights created in and to the respective properties, then the properties are not of a like kind. Illustrative of this, it provides that a leasehold interest in land cannot be exchanged for a fee title in land without tax consequences, unless the lease has "thirty years or more to run."[3] The implication is clear that the rights vested in the respective grantees in and to the properties exchanged must be of the same general character or of substantial equality. If not, then the properties exchanged are not of like kind within the meaning of the Code. It was so held in *Midfield Oil Co.*, 39 B. T. A. 1154, relied upon by respondent, and which sustains his contention here. There it was held that an oil payment limited in amount is different within the meaning of section 112 (b) (1) from an overriding royalty which continues as long as production lasts.

The reason there given for holding the properties unlike was because of the "differences in the rights created by the Holmans oil payment and the Dawson overriding royalty," which were held to be "differences of substance and not of mere form." The rights under the Holmans oil payments were to continue only until a specified sum of money was realized therefrom, while the Dawson royalty rights "continued for so long as oil or gas might be produced from the property."

In the instant case the rights created in the overriding royalties or oil payments were almost identical with those created in the Holmans oil payments, the only difference being the amount in dollars and cents to be paid, but in both, upon completion of payment of the sum specified, the oil interests assigned were to revert to the grantor.

[3] This provision of the regulation was discussed and approved in *Century Electric Co.*, 15 T. C. 581, affd. 192 F. 2d 155, certiorari denied 342 U. S. 954. In *Standard Envelope Manufacturing Co.*, 15 T. C. 41, it was held a lease for 24 years "was not equivalent to a fee."

*Midfield Oil Co., supra*, was approved and followed in *Kay Kimball*, 41 B. T. A. 940.

Petitioners cite *Commissioner* v. *Crichton*, 122 F. 2d 181, affirming *Kate J. Crichton*, 42 B. T. A. 490, where it was held that an exchange of an undivided interest in oil, gas, and other minerals for an undivided fee in a parcel of improved realty was an exchange within the meaning of section 112 (b) (1).

That case does not sustain petitioners' contention here. There the mineral interest conveyed was not for a limited period but was an outright and absolute conveyance of the "oil, gas and other minerals in, on and under and that may be produced from" the land therein described. There was no limitation or restriction of any kind. The difference in this respect from *Midfield Oil Co., supra*, is pointed out in the Board of Tax Appeals' opinion in the *Crichton* case, *supra*. (See 42 B. T. A. at p. 492.)

Petitioners rely on *Fleming* v. *Campbell*, (C. A. 5) 205 F. 2d 549, reversing a United States District Court for the Northern District of Texas case (Sept. 29, 1952). The appellate court in its reversal held that an exchange of a limited overriding royalty or oil payment solely for a determinable fee in an oil and gas lease was an exchange of property of like kind within the meaning of section 112 (b) (1). Apparently Government counsel there rested their case solely on the ground

that the mineral interest in the Ector County lands was an interest in fee and that in the Gregg County lands, for which it was exchanged, was a leasehold of a fee which does not have thirty or more years to run, and hence that therefore under the regulation the interests exchanged were not of like kind.

The court decided the case on the issue as presented and held that both interests exchanged were interests in minerals in place and hence both were interests in land; further, that neither interest was a "leasehold of a fee" in the sense that term is used in the regulation, and therefore the 30-year provision of the regulation did not apply. The issue there is not present in the instant case and the facts here are wholly different.

Here the exchange was not "mineral interests for mineral interests," but an exchange of a fee simple title, an absolute estate in ranch land for a limited mineral interest which expired when a definite sum of money was realized therefrom.

Notwithstanding the comprehensive terms of conveyance contained in the assignment of the mineral interest, the ceiling limitation therein, whereby the maximum amount the grantee could ever receive therefrom was a fixed sum of money with interest, stamps the extent of grantee's rights therein more in the nature of a mortgagee than that of owner. The grantee's interest was primarily monetary and of a temporary nature. The grantors at all times owned a residuary title

in the mineral property. In any event a temporary title to the oil properties, continuing only until a sum of money is realized therefrom, is not equivalent to an absolute and unconditional title in the ranch land. The rights created were wholly different. The properties here exchanged were not of like kind within the meaning of section 112 (b) (1).

Now that we have determined that there was a taxable gain from the exchange, we must ascertain whether it was ordinary income, as determined by respondent, or capital gain, as contended by petitioners. This question must be decided in favor of the petitioners upon authority of *John David Hawn*, 23 T. C. 516, *Lester A. Nordan*, 22 T. C. 1132, and *Caldwell* v. *Campbell, Jr.*, 218 F. 2d 567, from which this case is not distinguishable in principle. See *Walter A. Henshaw*, 23 T. C. 176. These cases hold that an oil payment is a capital asset and the gain derived from the sale or exchange of an oil payment may be given capital gains treatment. Similarly, the petitioners' gain from the exchange of the oil payments is entitled to capital gains treatment. Petitioners are sustained on this question.

In arriving at our conclusion that petitioners' gain was a capital gain, we have considered, but cannot sustain, respondent's contention that petitioners' transaction was the mere assignment of future income in exchange for a ranch.

## Issue II.

On October 5, 1949, C. C. Cross conveyed to F. Howard Walsh the fee simple title to certain urban real estate in Fort Worth, Texas. As the sole consideration for this land, F. Howard Walsh conveyed to Cross certain limited overriding royalties or oil payment interests. Walsh's conveyance to Cross was in part as follows:

F. HOWARD WALSH, does hereby, subject to the conditions and limitations hereinafter set out, bargain, sell, assign and convey unto C. C. CROSS, of Tarrant County, Texas, his heirs and assigns, the following described overriding royalty and mineral interests carved out of the interests owned by the undersigned grantor in and to the oil and gas leases and leasehold estates, insofar as they cover the tracts of land and leases described above,—such interests herein conveyed being the following fractional parts of the oil, in, under, or upon, or that may be produced from such tracts of land under the terms of said leases, to-wit:

(a) ¼ of ⅞ of such oil, insofar as all of the tracts and leases in Ward County above described are concerned, save and except Walsh's "Killough" Lease; and.

(b) ¼ of ⁷⁄₁₆ of such oil, insofar as such Killough Lease is concerned.

This grant is made subject to the following conditions and limitations, to-wit:

\* \* \* \* \* \* \*

(c) When and if CROSS, or his heirs and assigns, shall have received, under the terms of said conveyance and assignment, oil of the net value of SIXTY-FIVE THOUSAND AND NO/100 DOLLARS ($65,000.00), plus interest at the

rate of seven (7) per cent per annum on the balances unpaid from time to time (exclusive of gross production taxes, which may be deducted from CROSS'S part of the oil),—then CROSS shall have no further interest in said oil and gas leases or leasehold estate, and the oil then remaining in, under or upon said tracts of land, or thereafter produced therefrom; and the interests hereby conveyed shall automatically revert to WALSH, his heirs and assigns.

Cross's share of the oil produced from the property named in the conveyance, from the effective date of the conveyance to the close of 1952, amounted to:

| Year | Amount |
|------|--------|
| 1949 | $3, 909. 61 |
| 1950 | 22, 391. 12 |
| 1951 | 22, 673. 03 |
| 1952 | 21, 793. 90 |

On their 1949 income tax return F. Howard Walsh and his wife treated this transaction as an exchange of property of like kind under section 112 (b) (1). Respondent determined that the transaction produced ordinary depletable income for them. Respondent also determined that the real estate acquired by Walsh had a market value of $65,000, that the limited overriding royalties or oil payment interest had no basis in Walsh's hands, and that the allowance for depletion was $17,875, with a net income of $47,125 taxable to Walsh and his wife in 1949.

The exchange by F. Howard Walsh of an oil payment out of oil and gas leases situated in Ward County, Texas, for fee simple title to revenue-producing real estate situated in Fort Worth, Tarrant County, Texas, was not an exchange of property for property of a like kind and the gain derived therefrom is taxable income.

In this issue petitioners F. Howard Walsh and Mary D. Walsh conveyed an oil payment to C. C. Cross for a piece of urban real property. There is no real difference between this exchange and that we discussed in the first issue. Therefore, for the reasons stated in the first issue, petitioners' gain in this issue is taxed like the gain considered in the first issue.

*Issue III.*

On March 28, 1935, Mary D. Walsh acquired a 10-year endowment policy, No. 347056, from the Southwestern Life Insurance Company. She paid 10 annual premiums of $2,245.75 for this policy, and the insurance company was to pay her $25,000 on March 28, 1945. On July 13, 1943, before the maturity date of this policy, Mary D. Walsh and the insurance company agreed that the payment of $25,000 in one sum would be deferred for 10 years, and that after the maturity date interest on the principal sum would be added to the principal sum each year until March 28, 1955, and thereafter the interest would

be paid to her, or other designated payees.   Hereinafter we shall refer to this settlement agreement as the first *agreement.   Nothing was paid to Mary D. Walsh or to any one else by the insurance company, but respondent adjusted the income of petitioners F. Howard Walsh and Mary D. Walsh to include the sums of $2,132.18 in 1948 and $2,206.81 in 1949 as interest upon the amounts retained by the insurance company.

On April 28, 1935, Mary D. Walsh acquired a 10-year endowment policy, No. 274,057, from the Pan-American Life Insurance Company. She paid 10 annual premiums of $2,248.50 for this policy, and the insurance company agreed to pay her $25,000 on April 28, 1945.

On November 26, 1943, Mary D. Walsh and the insurance company entered into a settlement agreement relating to this policy.   Hereinafter we shall refer to this agreement as the second agreement.   Under this agreement, if the policy matured as an endowment, the net proceeds of the endowment would be retained for a period not exceeding 30 years.   This money in the insurance company's possession would be improved with interest at a rate apportioned by the board of directors annually, but never less than 3 per cent a year, compounded annually.   The insurance company was to pay this interest in monthly installments to Mary D. Walsh.   In 1948 and 1949 the insurance company paid her $739.92, but these amounts were not reported as her income.   Respondent adjusted her income to include these sums.

Under the first agreement, interest was to be added to petitioner's principal sum immediately after maturity, but the payments to her were not to begin until 10 years after maturity of the endowment policy.   Under the second, interest payments were to be paid petitioner in monthly installments beginning 1 month after maturity of the endowment policy.

Respondent adjusted petitioner's 1948 and 1949 income by adding the interest payments actually received under the second agreement and that interest credited to petitioner's account under the first agreement.   In contesting these adjustments petitioner relies on section 22 (b) (1) and (2) as authority for the exclusion of the interest payments from her gross income.   However, we do not think that these subsections are applicable.   Section 22 (b) (1) refers to amounts received under a life insurance contract paid by reason of the insured's death, and section 22 (b) (2) refers to the exclusion from gross income of certain amounts received as an annuity.   Neither subsection excludes from gross income interest payments as we now have before us. Cf. *Rubye R. Strauss*, 21 T. C. 104.

By the terms of the first agreement, the insurance company was to retain the amount due petitioner at maturity.   Interest was then to be added annually to this principal sum for 10 years, and thereafter

the interest as it accrued was to be paid petitioner or others designated by her. Except for a change in beneficiaries, the agreement provided that no change or amendments could be made, and payments could not be made thereunder until 1955.

In this first agreement petitioner has deliberately turned her back on income, and has in effect selected the year in which she will report it. This she may not do. Further, the whole arrangement for the nonacceptance of income was voluntary on petitioner's part, she was in no way forced to surrender her right to the proceeds of the matured policy, and she could have had the interest paid to her currently as she did in the second agreement. Petitioner, a cash basis taxpayer, cannot escape income tax by directing that accrued interest be accumulated for her benefit in the future. See *Theodore R. Bayard*, 16 T. C. 1345. Respondent must be sustained in that petitioner's income for 1948 and 1949 should include the interest credited to her account.

During each of the years 1948 and 1949 petitioner received $739.92 under the terms of the second agreement; these payments were denominated interest by both petitioner and the insurance company. Petitioner actually received this money, and she was entitled to use it without restriction. Under section 22 (a) interest is specifically included as an item of gross income; therefore, respondent is properly sustained on his addition of $739.92 to petitioner's gross income in each of the years 1948 and 1949.

*Decisions will be entered under Rule 50.*