CLEMENTE, INC; Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; GREGGO & FERRARA, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Clemente, Inc. v. Commissioner
Docket Nos. 3289-77, 12441-79.
United States Tax Court
T.C. Memo 1985-367; 1985 Tax Ct. Memo LEXIS 263; 50 T.C.M. (CCH) 497; T.C.M. (RIA) 85367; July 23, 1985. John E. Babiarz, Jr. and Jessie L. Burke, III, for the petitioners. Dermot F. Kennedy, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In a statutory notice dated May 29, 1979, respondent determined Federal income tax deficiencies against petitioner Greggo & Ferrara, Inc. ("Greggo & Ferrara"), in the amounts of $114,944.99 and $31,224,35 for its taxable years ending September 30, 1973 and September 30, 1974, respectively. In a statutory notice dated January 7, 1977, respondent determined *265 a Federal income tax deficiency of $42,480 against petitioner Clemente, Inc. ("Clemente") for its taxable year ending September 30, 1973. The separate petitions filed by each petitioner herein have been consolidated for purposes of trial, briefing, and opinion. After certain concessions by the parties, the issues for decision are: (1) The amount of cost depletion deductions allowable to Greggo & Ferrara with respect to certain gravel [1] extracted during the years in issue, (2) the amount of depreciation deductions allowable to Greggo & Ferrara with respect to two buildings, and (3) whether Clemente is entitled to tax-free treatment under section 1031 [2] with respect to the exchange of an 8-acre parcel of land for the right to extract gravel from another parcel of land. FINDINGS OF FACT Some of the facts have *266 been stipulated and are found accordingly. Greggo & Ferrara was organized as a corporation pursuant to the laws of Delaware in 1948. During the years in issue, Greggo & Ferrara was engaged in the business of excavation and road construction in and about New Castle County, Delaware, where it was one of the major road construction firms. In its road construction business, Greggo & Ferrara required large quantities of gravel and therefore it owned a number of parcels of land from which it extracted gravel. Clemente was organized as a corporation pursuant to the laws of Delaware in 1952. During the years in issue, Clemente was engaged in the business of operating a bus stop and restaurant adjacent to land owned by Greggo & Ferrara. Clemente owned land for investment, but was not engaged in development of the land. During the summer of 1973, the major road construction project of Greggo & Ferrara was the construction of a portion of Interstate Highway 495, a project that required approximately 1.2-million cubic yeads of gravel for the road base. The gravel had been extracted from other land in the vicinity that previously had been used by Greggo & Ferrara as a source of gravel, *267 making it essential that Greggo & Ferrara obtain a new source of gravel, preferably close to the construction area. On August 3, 1973, Greggo & Ferrara entered into a contract with Gulf Oil Corporation ("Gulf"), pursuant to which Greggo & Ferrara agreed to purchase from Gulf a fee simple interest in a parcel of land (the "Gulf Tract") located in New Castle County, Delaware, consisting of 18.672 acres. Total consideration paid for the 18.672 acres was $435,000. The rear 15 acres of this parcel contained substantial deposits of gravel and were zoned "M-1" or "light industrial." The remaining 3.672 acres of this parcel were zoned "C-3" or "commercial" and fronted on U.S. Route 40. Two small cinder block buildings were located on the 3.672 acres. The two buildings were in dilapidated condition at the time of purchase, and required extensive repairs before they could be rented out. The first rental of the buildings by Greggo & Ferrara occurred in January of 1974. Greggo & Ferrara's primary purpose in purchasing the Gulf Tract was to extract the gravel located in the rear 15 acres. Greggo & Ferrara did not rule out the possibility of developing the Gulf Tract for commercial purposes *268 at some time in the future; however, it had no definite plans in that regard at the time of purchase. The purchase contract between Gulf and Greggo & Ferrara did not allocate the purchase price between the buildings, the commercial land, the gravel in place in the rear 15 acres, and the value of the rear 15 acres after extraction of the gravel (this latter interest is hereinafter referred to as a "residual interest in the land"), but simply recited one price for the entire parcel. It is the allocation of Greggo & Ferrara's total cost basis of $435,000 between the four compoents of the 18.672 acres of the Gulf Tract that is the primary source of controversy herein. When that allocation is determined, the correct depletion deductions can be determined. At the time Greggo & Ferrara purchased the Gulf Tract, New Castle County was attempting to control an environmental problem that had originated immediately southeast of the Gulf Tract in an area known as the Llangollen landfill. The Llangollen landfill covered some 68 acres and prior to 1960 had been used as a site for the extraction of sand and gravel. Thereafter, from 1960 to 1968, New Castle County used the site for the disposal *269 of domestic, commercial, and industrial wastes. In approximately 1971, a resident who lived near the Llangollen landfill area reported to the county that the water well on her property was polluted. Upon investigation, it was determined that the pollution was caused by "leachate," a liquid formed when rainwater percolates through a waste deposit area, dissolves various organic and inorganic substances therein, and infiltrates into the local water table. The leachate had spread from the Llangollen landfill, and was continuing to spread in a southeasterly direction. The leachate pollution from the Llangollen landfill was of particular concern to New Castle County and Delaware State officials because of the threat it posed to the Artesian Water Company well, which provided water to the local community, and also to the entire Potomac aquifer, which constituted approximately 30 percent of the developed water resources in the county. The county hired a private consulting firm to study the leachate problem and to submit a proposal for its alleviation. The consulting firm conducted its study in 1972 and 1973, and developed a proposal to monitor the extent of leachate pollution in the *270 local water supply, and to construct recovery wells to pump the leachate out of the ground. The extent of publicity given to the leachate pollution from the Llangollen landfill, and its effect in 1973 on development plans in the affected area, is a point of much disagreement between the parties. It is clear from the record, however, that in 1973 a number of articles in local newspapers were written about the leachate pollution from the Llangollen landfill and on April 12, 1973, the county announced that an authorization of $1.9 million was being requested from the county council to implement the recommendations of the private consulting firm. Additionally, development in the vicinity of the Llangollen landfill was restricted in that developers of any new project were required to demonstrate that the proposed project would not exacerbate the leachate pollution of the water supply. Several proposed projects in the vicinity of the Gulf Tract received approval from the county council and proceeded to completion, including a major development known as the "Airport Industrial Park," which was developed from 1972 through 1974 approximately one mile north of the Gulf Tract. Although *271 New Castle County procedures allowed for the submission of a preliminary zoning application ("PZA") to determine preliminarily whether the county would object to a proposed development, Greggo & Ferrara did not submit such an application during the years in issue with respect to the Gulf Tract. In 1972 and 1973, Greggo & Ferrara and Clemente entered into three contracts with each other with respect to the Gulf Tract and two adjacent properties. Next to the Gulf Tract and just behind the parcel of land on which Clemente operated its bus stop and restaurant, was a 7-1/2 acre parcel of property owned by Clemente. On the other side of that 7-1/2 acre parcel of land was a large parcel of land owned by Greggo & Ferrara and referred to by the parties as the "Walker Farm." Most of the gravel from the Walker Farm had been extracted in years prior to 1972. The first contract, dated August 29, 1972, pertained to the 7-1/2 acre Clemente parcel of land and gave Greggo & Ferrara the right to extract an estimated 150,035 cubic yards of gravel from that parcel. In return, Greggo & Ferrara agreed to pay Clemente $ .50 for each cubic yard of gravel extracted, up to a maximum payment of $40,000. *272 In addition to the payment required for the gravel, Greggo & Ferrara agreed to grade the 7-1/2 acre parcel after extracting the gravel in accordance with a specified grading plan referred to by the parties as "Plan A." The second contract, dated June 26, 1973, amended the August 29, 1972, contract by authorizing the removal by Greggo & Ferrara of an additional estimated 87,000 cubic yards of gravel from the 7-1/2 acre Clemente parcel. In return for the right to extract the additional gravel, Greggo & Ferrara agreed to pay Clemente a single fee of $24,800. Greggo & Ferrara also agreed to grant Clemente a 60-foot easement across the adjacent Walker Farm property, in order to allow Clemente access from its 7-1/2 acre parcel to U.S. Route 40. The exact location of the easement on the Walker Farm property was to be determined later. Greggo & Ferrara also agreed to pave the strip of land to be covered by the easement at an unspecified time in the future, in payment for which $5,000 was deducted from the price to be paid by Greggo & Ferrara for the gravel it extracted. Under the June 26, 1973, contract, grading on the 7-1/2 acre Clemente parcel was to be performed by Greggo & Ferrara *273 in accordance with "Plan B," which, among other changes made with respect to Plan A, provided for the removal of a ramp and for extraction of gravel to a lower elevation on a portion of the property, thereby allowing for removal of more gravel. The third contract between Greggo & Ferrara and Clemente was dated June 27, 1973, and is the contract to which the section 1031 issue herein relates. Pursuant to that agreement, Greggo & Ferrara obtained the right to extract gravel from the "land bank" or border of the 7-1/2 acre Clemente parcel (hereinafter the "Clemente Bank"), which adjoined and separated the Gulf Tract (which Gergoo & Ferrara was then in the process of purchasing from Gulf) from the 7-1/2 acre parcel. The Clemente Bank was estimated by the parties to contain approximately 72,000 cubic yards of gravel. In return for the right to extract this gravel, Greggo & Ferrara agreed to subdivide off from the Gulf Tract a specified 8 acres of land and to transfer a fee interest therein to Clemente, after Greggo & Ferrara had completed the extraction of gravel therefrom and had graded the 8 acres to the same elevation as the adjoining Clemente and Walker Farm properties. [3] The agreement *274 was made contingent upon Greggo & Ferrara's acquiring title to the Gulf property in fee simple. The socalled "Gravel Property" (which represents the total gravel in both the Gulf Tract and the Clemente Bank) contained 442,000 cubic yards of gravel as of April 25, 1973. During Greggo & Ferrara's taxable years ending September 30, 1973 and September 30, 1974, Greggo & Ferrara extracted from the Gravel Property 31,002.25 and 370,979.32 cubic yards of gravel, respectively. OPINION I. Depletion Deduction Issue
In general, section 611 provides a reasonable allowance for depletion as a deduction in computing taxable income in the case of extraction of minerals from mines and other natural deposits, the amount of which is to be determined pursuant to regulations prescribed by the Secretary of the Treasury. [4] Section 612 provides that the taxpayer's cost basis upon which the *275 reasonable allowance for depletion is to be allowed shall be the adjusted tax basis as provided in sections 1011 and 1012. [5]
*276 The pertinent regulations provide that after a taxpayer's cost basis in a mineral deposit is determined, such basis is to be divided by the number of units of mineral remaining in the deposit at the end of the taxable year, including the units sold during the year. [6] The resulting quotient is referred to as the "depletion unit." Finally, the depletion unit is to be multiplied by the number of units sold during the year, with the product of that calculation producing the cost depletion deduction. See section 1.611-2(a)(1), Income Tax Regs.
As previously stated, the controversy herein does not involve the units of gravel sold or used in the business, nor the units of gravel remaining as of the end of Greggo & Ferrara's 1973 and 1974 taxable years. What is controverted is the amount of Greggo & Ferrara's cost basis in the gravel in the Gulf Tract and in the Clemente Bank. The calculation of Greggo & Ferrara's cost basis in the gravel is complicated by *277 the fact that by its payment of $435,000 for the gravel in the Gulf Tract, Greggo & Ferrara also acquired two buildings, a fee interest in 3.672 acres of commercial frontage land and the residual interest in the 15 acres of light industrial land from which the gravel was to be extracted. Also, as previously explained herein, at the same time that the purchase from Gulf occurred, Greggo & Ferrara promised to subdivide 8 acres off of the rear 15 acres of the Gulf Tract and to transfer to Clemente the residual interest in the 8 acres in exchange for the right to extract the gravel in the Clemente Bank. Both parties view these two transactions together (namely, the acquisition by Greggo & Ferrara of the Gulf Tract and the exchange by Greggo & Ferrara of the residual interest in 8 acres of the Gulf Tract for the right to extract the gravel in the Clemente Bank). Accordingly, in allocating the $435,000 cost, the residual interest in the 8 acres of the Gulf Tract that were transferred to Clemente can be disregarded and, in place thereof, the value of the interest in the gravel in the Clemente Bank is to be determined and is to receive an allocation of the appropriate portion of Greggo *278 & Ferrara's $435,000 cost of the property in question. Since the two buildings, the fee interest in the 3.672 commercial acres, and the residual interest in the remaining 7 acres of the 15 acres of the Gulf Tract are not eligible for the depletion allowance, in order to calculate Greggo & Ferrara's cost basis in the gravel, an allocation must be made of the consideration paid between the gravel and the various nondepletable assets acquired. Section 1.612-1(b), Income Tax Regs.[7]
As a threshold matter, respondent claims that the $435,000 paid Greggo & Ferrara for the Gulf Tract did not reflect the true fair market value thereof. Under the authority of section 1.611-1(d)(4), Income Tax Regs., respondent contends that Greggo & Ferrara's cost or basis *279 in the various assets must be determined based upon their proportion of the actual cost (namely, $435,000) which the value of those separate assets bears to the actual fair market value of the entire Gulf Tract. Respondent contends that the actual fair market value of the Gulf Tract was $443,800 on August 3, 1973. It is well established that the best evidence of fair market value is the amount paid for property in an arm's-length transaction at or near the relevant valuation date. Chiu v. Commissioner,84 T.C. 722, 743 (1985). Respondent does not argue that the acquisition of the Gulf Tract by Greggo & Ferrara was other than at arm's length, and respondent has not presented sufficient evidence to convince us that the fair market value of the Gulf Tract at the time of acquisition was anything other than $435,000. We must now allocate the $435,000 among the various assets acquired from Gulf. Both Greggo & Ferrara and respondent have submitted expert testimony in support of their respective valuations for the two buildings, for the 3.7 acres of commercially zoned frontage property and for the 7 acres of the Gulf Tract with respect to which Greggo & Ferrara retained *280 a nondepletable residual interest. Greggo & Ferrara and respondent then subtract the total values so determined for those assets from the total cost of $435,000 and thereby arrive at the amount of Greggo & Ferrara's cost basis which is to be allocated to the depletable gravel. The contentions of the parties with respect to the separate assets are reflected below: Values as alleged
Values as alleged
Property
by Greggo & Ferrara
by respondent
2 buildings
$ 16,100
$ 21,800
3.7 acres of commercial
frontage property
120,900
188,700
7 acres of light
industrial property
(residual interest
after extraction of
gravel)
3,500
108,500
Total for nondepletable
assets
$140,500
$319,000
Based on the above totals, Greggo & Ferrara contends that the depletable gravel had a cost basis to it of $294,500, [8] and respondent contends that the depletable gravel had a cost basis to Greggo & Ferrara of $116,000. [9]
An allocation of Greggo & Ferrara's basis among the various assets is, of course, a question of fact that turns on the fair market value of each asset. As has often been *281 stated, the valuation of property is an inexact science at best, and if not settled by the parties is capable of resolution by the courts only by "Solomon-like" pronouncements. Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980); Messing v. Commissioner,48 T.C. 502, 512 (1967). See Akers v. Commissioner,T.C. Memo. 1984-208; Estate of Slutsky v. Commissioner,T.C. Memo. 1983-578. In determining fair market value, we are bound to consider all of the relevant facts and testimony. Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. See Philadelphia Steel & Iron Corp. v. Commissioner,T.C. Memo. 1964-93, affd. per curiam 344 F.2d 964 (3d Cir. 1965). The testimony of expert witnesses is not to be "accepted as gospel," and their testimony must be evaluated in light of the entire record in a case. Akers v. Commissioner,supra,T.C. Memo. 1984-208, 47 T.C.M. 1621, 1632; 53 P-H. Memo T.C. par. 84,208 at 84-788. Based upon the above principles we proceed to make our findings *282 as to the cost to be allocated to each of the assets in question. With respect to the two cinder block buildings, the difference between the values placed thereon by the respective experts is in large part attributable to whether the replacement cost of the two buildings should be reduced by a factor of 80 percent (Greggo & Ferrara's contention) or by a factor of 70 percent (respondent's contention) due to the extremely poor condition of the buildings. Based upon our evaluation of the evidence submitted, we conclude that the value of the buildings was $20,000. The value of the 3.672 acres of commercial land was $120,900, if the opinion of Greggo & Ferrara's expert witness is accepted, or $188,700, if the opinion of respondent's expert is accepted. The difference of $67,800 between these two opinions is due in part to the failure of respondent's expert to take into account the sale of a comparable parcel of land because he thought it was not located in close proximity to the subject parcel of land. In fact, it was located just a few hundred yards away and supports the opinion of Greggo & Ferrara's expert witness. Based upon our evaluation of the evidence submitted concerning the *283 3.7 acres of commercial land, we conclude that the value thereof was $120,900 on the acquisition date. The last asset to value herein which does not qualify for the depletion allowance is the residual interest in the 7 acres of rear, light industrial land on the Gulf tract. With respect to the value of this interest, Greggo & Ferrara and respondent are in significant disagreement. The expert witness who testified on behalf of Greggo & Ferrara concludes that the interest in the land after the gravel was extracted would have a value of only $500 per acre or a total value of only $3,500. Respondent's expert witness contends that the same residual interest in the rear 7 acres had a value of $15,500 per acre or a total value of $108,500. For the reasons explained below, we cannot accept in entirety the analysis of either expert with respect to the residual interest in the 7 acres. Clearly there was some significant development potential in the 7 acres. The limitations on extraction of gravel to certain maximum specified depths below the original ground level and the requirement that Greggo & Ferrara grade the land to certain specifications after extraction of the gravel were directed *284 at maintaining the land in a condition suitable for future development. Extraction of gravel had occurred in years prior to 1973 at other properties in the vicinity of the land in question and some development of those properties had occurred or was underway by 1973. Greggo & Ferrara's expert witness places insufficient significance on the fact that the 7 acres had development potential which enhanced its value over that of a mere hole in the ground. On the other hand, respondent's expert places excessive emphasis on the development potential of the 7 acres. He does not adequately recognize the significant amount of other excavated land in the same vicinity which was available in 1973 or which would soon thereafter become available and which would be in competition with the 7 acres in question for developmental purposes. Examples of other excavated properties in the immediate vicinity of the 7 acres are the Walker Farm, the property immediately adjacent to the 7 acres in question behind the Clemente bus terminal, and the 8 acres of the original Gulf Tract that were transferred by Greggo & Ferrara to Clemente in exchange for the right to mine the gravel in the Clemente Bank. *285 Respondent's expert also minimizes the effect on the value of the 7 acres of the pollution problems associated with the nearby Llangollen landfill. As we have found, that problem was a matter of public knowledge on August 3, 1973. A willing buyer and seller, both having knowledge of all relevant facts, would have been aware of that problem, which would have diminished the value of the 7 acres. In our opinion the best evidence of the residual interest in the excavated 7 acres is the per acre value of the residual interest in the adjoining excavated 8 acres of the Gulf Tract, which was transferred in an arm's-length transaction on June 27, 1973, to Clemente. The primary shareholder of Clemente testified that Clemente valued the residual interest in the excavated 8 acres, title to which Clemente received in that transaction, at approximately $2,500 to $3,500 per acre. The actual deed that was recorded with respect to that transaction recited a consideration paid by Clemente for the property of $16,000 cash or $2,000 per acre. Based upon the evidence relevant to this issue, we conclude that the value per acre of the excavated 7 acres in dispute was $3,500 as of August 3, 1973 or a *286 total value of $24,500. Having arrived at the values for each of the nondepletable assets on the relevant valuation date, the total value thereof can be subtracted from the $435,000 cost of all of the property to arrive at the value of the depletable gravel in question, as follows: Greggo & Ferrara's cost
$435,000
Less value of: 2 buildings
20,000
3.7 commercial acres
120,900
7 light industrial
acres (residual
interest therein)
24,500
$165,400
Value of gravel
$269,600
Accordingly, the parties are to compute the appropriate cost depletion allowance using $269,600 as Greggo & Ferrara's basis for the gravel. II. Depreciation Issue
The next issue for our consideration is the amount of depreciation deductions that are allowable to Greggo & Ferrara in its 1973 and 1974 taxable years with respect to the two cinder block buildings located on the commercially zoned portion of the Gulf Tract. Respondent disputes (1) the $16,000 that Greggo & Ferrara claims as its cost basis in the buildings and asserts that the correct cost basis is $21,800; [10] (2) that the buildings were placed in service during Greggo & Ferrara's 1973 taxable year *287 and (3) that Greggo & Ferrara should be allowed to raise for the first time in post trial briefs an issue as to the proper useful lives of the buildings. With regard first to respondent's third point, in Greggo & Ferrara's Federal income tax return for its 1973 taxable year, and also in its pettion herein, Greggo & Ferrara claimed a 25-year useful life for the buildings. In its post trial brief it claims a useful life of seven years for the buildings. We decline to consider this new issue at this point in time. Lynch v. Commissioner,83 T.C. 597, 612-613 (1984); Graham v. Commissioner,79 T.C. 415, 423 (1982). With regard to Greggo & Ferrara's original basis in computing depreciation, we have held (in connection with the depletion issue previously discussed herein) that the buildings had an original cost basis to Greggo & Ferrara of $20,000, and we renew that finding herein. We now turn to respondent's placed-in-service argument. Section 167(a) allows a depreciation *288 deduction for exhaustion, wear and tear (including obsolescence) for property used in the trade or business or held for the production of income. The period for depreciation begins when the asset is "placed in service," and a proportionate portion of a year's depreciation is allowed for that part of the first and last year during which the asset was in service. Sec. 1.167(a)-10(b), Income Tax Regs.Section 1.167(a)-11(e)(1)(i), Income Tax Regs., provides in relevant part: The term "first placed in service" refers to the time the property is first placed in service by the taxpayer, not to the first time the property is placed in service. Property is first placed in service when first placed in a condition or state of readiness and advilability for a specifically assigned function * * *. [Emphasis added.] It has been recognized by this and other courts that depreciation deductions are available under the so-called "idle asset" rule in situations where the asset involved, while not in actual use during the year in issue, was nevertheless devoted to the business of the taxpayer and ready for use should the occasion arise. See P. Dougherty Co. v. Commissioner,159 F.2d 269 (4th Cir. 1946); *289 Kittredge v. Commissioner,88 F.2d 632 (2d Cir. 1937); Piggly Wiggly Southern, Inc; et al v. Commissioner,84 T.C. 739, 745-746 (1985); and Yellow Cab Company of Pittsburgh v. Driscoll,24 F.Supp. 993 (W.D. Pa. 1938). In the context of rental property, Jephson v. Commissioner,37 B.T.A. 1117 (1938), involved a taxpayer who purchased a house for the purpose of renting it out, but was unable to do so despite listing the house with a broker and showing it to prospective tenants. The taxpayer was nevertheless found to be in the trade or business of renting and was allowed depreciation deductions in addition to maintenance expenses. Few facts are contained in the record herein relating to the date the buildings were placed in service. Although purchased by Greggo & Ferrara on August 3, 1973, the buildings were not used in any trade or business until they were rented out sometime in January 1974. The buildings were in a dilapidated condition when acquired and required extensive renovation and repairs before they could be rented out. Having reviewed the record, we hold that Greggo & Ferrara has failed to establish *290 that the buildings were placed in service by September 30, 1973, and Greggo & Ferrara is therefore not entitled to a depreciation deduction with respect to its taxable year ending on that day. III. Section 1031 Issue
The final issue concerns the tax treatment to Clemente of the exchange entered into between Greggo & Ferrara and Clemente, pursuant to the June 27, 1973, contract. Under that contract, Greggo & Ferrara acquired the right to remove all of the gravel contained in the Clemente Bank in exchange for Greggo & Ferrara's promise to transfer the residual interest in 8 excavated acres of light industrial land from the Gulf Tract to Clemente. The Clemente Bank was estimated to contain 47,000 cubic yards of gravel, but Greggo & Ferrara was entitled to remove all of the gravel actually contained therein, provided it did not extract gravel below the depth of Clemente's adjoining land (approximately 20-25 feet deep). The issue herein is whether that exchange qualifies as a tax-free exchange pursuant to section 1031. Respondent asserts that it does not qualify because the properties exchanged were not of "like-kind" and because the exchange was not simultaneous. [11] *291 Section 1031(a) provides for nonrecognition of gain or loss where property held for productive use in a trade or business or for investment is exchanged solely for property of a like kind to be held for similar uses. As used in section 1031(a), the words "like kind" have reference to the nature or character of the property, and not to its grade or quality. For example, the fact that some of the real estate in an exchange is improved and other real estate is unimproved is not material for that fact relates only to the grade or quality of the property and not to its kind or class. Sec. 1.1031(a)-1(b), Income Tax Regs.
The underlying rationale for allowing nonrecognition of gain or loss is the concept that the taxpayer's economic situation after the exchange is fundamentally the same as it was before the transaction. This is expressed in the Committee Report to the predecessor statute to section 1031 as follows: [I]f the taxpayer's money is still tied up in the same kind of property as that in which it was originally *292 invested, he is not allowed to compute and deduct his theoretical loss on the exchange, nor is he charged with a tax upon his theoretical profit. * * * [H. Rept. 704, 73d Cong., 2d Sess. (1934); 1939-1 C.B. (Part 2), 554, 564.] See also Biggs v. Commissioner,69 T.C. 905, 913 (1978), affd. 632 F.2d 1171 (5th Cir. 1980). The underlying assumption of section 1031(a) is that the new property is substantially a continuation of the old investment still unliquidated. Commissioner v. P.G. Lake, Inc.,356 U.S. 260 268 (1958). Therefore, under section 1031(a), a comparison of the properties exchanged is appropriate in order to determine whether or not their nature or character is substantially alike. In so doing-- consideration must be given to the respective interests in the physical properties, the nature of the title conveyed, the rights of the parties, the duration of the interests, and any other factor bearing on the nature or character of the properties as distinguished from their grade or quality. Significantly, as the standard for comparison, section 1031(a) refers to property of a like--not an identical--kind. *293 The comparison should be directed to ascertaining whether the taxpayer, in making the exchange, has used his property to acquire a new kind of asset or has merely exchanged it for an asset of like nature or character. [Koch v. Commissioner,71 T.C. 54, 65 (1978).] In Commissioner v. Crichton,122 F.2d 181, 182 (5th Cir. 1941), affg. 42 B.T.A. 490 (1940), the Fifth Circuit held that the exchange of an overriding royalty interest in minerals for a city lot qualified as a like-kind exchange. See also Rev. Rul. 68-331, 1968-1 C.B. 352, which held that the exchange of an oil producing lease for a fee simple title to a ranch qualified as a like-kind exchange. In Fleming v. Commissioner,24 T.C. 818, 823-824 (1955), affd. sub nom. Commissioner v. P.G. Lake, Inc.,356 U.S. 260 (1958), revg. 241 F.2d 78 (5th Cir. 1957), we held that an assignment of carved-out oil payment rights and a fee interest in real estate were not like-kind properties although the applicable state law characterized the oil payment rights as an interest in real estate. In Koch v. Commissioner,71 T.C. 54, 65 (1978), *294 we explained the difference between the holdings of Crichton and Fleming as follows: The main distinction between the two transactions is the duration of the interests--an overriding royalty interest continues until the mineral deposit is exhausted whereas a carved-out oil payment right terminates usually when a specified quantity of minerals has been produced or a stated amount of proceeds from the sale of minerals has been received. We conclude that the exchange between Clemente and Greggo & Ferrara resembles the facts of Fleming more than it does the facts of Crichton, and therefore we conclude that the exchange does not qualify as a like-kind exchange. While it is true, as Clemente points out, that Greggo & Ferrara was not limited to extracting only the 72,000 cubic yards of gravel that the Clemente Bank was estimated to contain, it is also true that Greggo & Ferrara did not receive the right to extract an unlimited quantity of gravel from the Clemente Bank. Rather, Greggo & Ferrara was limited to extracting gravel only from the elevated bank designated, and Greggo & Ferrara was required to adhere to a grading plan which prohibited the extraction of gravel *295 in the Clemente Bank below the level of the adjoining land. This restriction limited the amount of gravel that could be removed. Therefore, Greggo & Ferrara's interest is not similar to the unlimited "overriding royalty interest" present in Crichton, but is similar to the limited "carved-out" royalty interest in Fleming.
A comparison of the respective positions of Clemente and Greggo & Ferrara after the exchange transaction is relevant. After the transaction, Clemente ended up with (1) its originial land, at a lower elevation (due to the gravel extracted) and with grading services completed, thereby bringing the elevation to the same level as the adjoining property, and (2) a new 8-acre tract of land which adjoined its original land. Greggo & Ferrara, however, ended up with approximately 72,000 cubic yards of gravel which had, by that time, been carried away and used in one or more of its many construction projects. In effect, Clemente sold gravel and bought land; Greggo & Ferrara sold land and bought gravel. It is apparent to us that there was no continuity of investment in the manner contemplated by section 1031(a). It follows that Clemente must recognize gain upon *296 its exchange of the gravel in the Clemente Bank, in an amount equal to the amount realized as determined herein (namely 8 acres of land at $3,500 per acre), less Clemente's adjusted basis in the gravel under section 1011. In accordance with the foregoing resolution of the issues, Decisions will be entered under Rule 155.
Footnotes
1. The technical term for the material involved in this case is "borrow". However, we have used the word "gravel," the term used by the parties herein. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
3. The grading plan provided for the removal of gravel to elevations ranging from 25 to 30 feet below the original elevation in order to conform the elevation of the property after extraction of gravel to the level of the adjoining properties from which gravel also had been or was to be extracted.↩
4. Section 611(a) provides as follows: SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION. (a) General Rule.--In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. For purposes of this part, the term "mines" includes deposits of waste or residue, the extraction of ores or minerals from which is treated as mining under section 613(c). In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this section for subsequent taxable years shall be based on such revised estimate. ↩
5. Section 613 provides an alternative method of determining a depletion allowance based upon a percentage of the income generated by the mineral deposit mined. The parties do not suggest that that method is properly applicable herein, apparently because Greggo & Ferrara used the gravel in own business and did not sell it.↩
6. The parties agree herein that the number of units used in Greggo & Ferrara's construction business during the year is to be treated as the number of units of gravel sold during the year, for purposes of this calculation.↩
7. Section 1.612-1(b), Income Tax Regs., in pertinent part, provides as follows: (1) The basis for cost depletion of mineral or timber property does not include: * * * (ii) The residual value of land and improvements at the end of operations. In the case of any mineral property the basis for cost depletion does not include amounts representing the cost or value of land for purposes other than mineral production. * * *↩
8. $435,000 - $140,500 = $294,500. ↩
9. $435,000 - $319,000 = $116,000.↩
10. We have here the unusual situation of the taxpayer seeking a lower basis and respondent seeking a higher basis due to their respective positions on the depletion issue.↩
11. In light of our resolution of the like-kind argument, it is not necessary to address respondent's contention that the exchange was not simultaneous.↩