ROBERT S. COIT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Coit v. Commissioner
Docket No. 5752-78.
United States Tax Court
T.C. Memo 1987-509; 1987 Tax Ct. Memo LEXIS 505; 54 T.C.M. (CCH) 816; T.C.M. (RIA) 87509; September 29, 1987. Christopher M. Weil and Anthony Petrocchi, for the petitioner. Jayne M. Wessels and A. Shawn Noonan, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In a statutory notice of deficiency dates March 8, 1978, respondent determined deficiencies in petitioner's and his wife's joint Federal income tax liabilities for 197l, 1972, and 1973, as follows: Addition to Tax
Year
Deficiency
Sec. 6653(a) I.R.C. [1]
1971
$ 668,514
-0-
1972
170,680
$ 8,534
1973
196,803
9,840
During the years at issue, petitioner was an investor in several limited partnerships that developed low-income housing projects in the southwestern United States. This is a test case involving *507 partnership losses flowing from the limited partnerships to the various individual investors. The particular partnership whose claimed losses are at issue in this test case is Town and Country Village Apartments, Ltd. The primary issues for decision concern the deductibility of interest, various fees, and depreciation claimed by Town and Country Village Apartments, Ltd., on its Federal partnership tax returns. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner Robert S. Coit resided in Dallas, Texas, at the time the petition was filed. Petitioner timely filed joint Federal income tax returns for 1971, 1972, and 1973. During the years in issue, petitioner was an investor in Town and Country Village Apartments, Ltd. ("Town and Country"), a limited partnership organized in 1971 under the laws of the State of Oklahoma. From its inception until December 15, 1972, Town and Country had two general partners, Harry D. Hawn ("Hawn") and American Urban Corp., and a total of four limited partners, including petitioner. During that time, petitioner held a 56-percent interest in Town and Country. After December 15, 1972, petitioner held a *508 one-percent interest in Town and Country. Town and Country reported receipts and disbursements under the cash method of accounting. The total capitalization of Town and Country is not established in the record. Town and Country was organized for the purpose of constructing, owning, and operating a multifamily apartment project for low- and moderate-income families. The project was known as the Town and Country Village Apartments and was located in Oklahoma City, Oklahoma. When completed, the project would consist of 26 two-story apartment buildings, containing a total of 201 separate apartment units, ranging in size from efficiency apartments to four-bedroom units. Four community buildings also were to be constructed as part of the project. Pursuant to a construction contract with W. P. "Bill" Atkinson Enterprises, Inc. ("Atkinson"), the apartment project was to be constructed between December of 1971 and May of 1974. The construction contract provided that the price to be paid Atkinson would be the actual cost of constructing the project plus a fee of $ 115,814. Town and Country obtained financing for the project from Midwest Mortgage Co. ("Midwest"). Town and Country *509 executed in favor of Midwest a nonrecourse promissory note dated December 29, 1971, in the amount of $ 3,124,600, which bore simple interest at seven percent per annum. From January of 1972 through May of 1974, only interest was due on the promissory note. Thereafter, principal and accrued interest were due in monthly installments of $ 19,417.25. The loan was to be fully paid by May 1, 2014. As a condition of the $ 3,124,600 loan, Town and Country was required by Midwest to place $ 118,435 in cash in an escrow account at Midwest prior to execution of the loan agreement. The $ 118,435 was obtained by Town and Country from partnership contributions and was deposited into the escrow account check dated December 30, 1971. That amount represented the amount (over and above the $ 3,124,600 loan proceeds) that was estimated to be necessary to complete construction of the project. The loan agreement stated that the $ 118,435 deposited into the escrow account from partnership contributions was to be used by Town and Country to pay expenses of the project before any disbursements of loan proceeds were to be made to the partnership. On or about December 29, 1971, petitioner, or behalf *510 of Town and Country, entered into a contract with Atkinson for the purchase of the land on which the project was to be built. The purchase price of $ 374,952 for the land was payable in the form of a $ 60,000 cash downpayment, a $ 60,600 deferred payment due June 30, 1972, and a $ 254,952 deferred payment due at the completion of the project. Prior to the sale, Atkinson received a commitment from the Federal Housing Administration ("FHA") to guarantee loans made to develop the land. That FHA commitment also was sold to or assigned to petitioner on behalf of Town and Country as part of the purchase of the land, and the amount Town and Country paid for the commitment was reflected in the $ 374,952 purchase price. Atkinson apparently also had obtained a loan commitment from Midwest to finance the project, and Atkinson was obligated to pay a loan fee, or points, to Midwest in the amount of $ 124,987 as part of the cost of the loan. As a result of its purchase, Town and Country obtained the land, the FHA guarantee, as well as the loan commitment from Midwest, and Town and Country became obligated to pay the loan points to Midwest. Under the terms of the contract between Atkinson *511 and petitioner, petitioner on behalf of Town and Country was given the option of paying the $ 124,987 in points directly to Midwest instead of paying it to Atkinson. On December 30, 1971, petitioner issued a personal check to Midwest in the amount of $ 121,680 in payment of the points, in lieu of making such payment to Atkinson. [2]
As indicated, the financing and construction of the apartment project qualified for assistance from the FHA, a division of the Department of Housing and Urban Development ("HUD"), pursuant to the moderate-and middle-income rental housing program under section 207 of the National Housing Act. [3] The primary assistance provided by the FHA under this program was to insure or guarantee repayment of construction loans made to developers by third-party lenders. Pursuant to this program, FHA issued a guarantee to Midwest with respect to its $ 3,124,600 loan to Town and Country. During construction, Town and Country was required to *512 submit to Midwest and to the FHA a list and description of current construction costs. Only after Midwest and the FHA approved the costs could loan proceeds be disbursed with the protection of the FHA guarantee. Pursuant to the above procedures, on December 29, 1971, Town and Country requested the first disbursement of funds from Midwest in the amount of $ 333,988. This disbursement was approved by Midwest and the FHA. Of the $ 333,988 approved for disbursement, $ 118,435 represented a disbursement of partnership capital contributions that Town and Country had deposited into the escrow account at Midwest, and the $ 215,543 balance represented a disbursement of loan proceeds. Town and Country indicated on the first request for disbursement of funds that part of the $ 333,988 would be used to pay to Midwest an "interim financing fee" in the amount of $ 62,492 with respect to the $ 3,124,600 loan and to pay "other fees" in the amount of $ 1,500. On December 30, 1971, Midwest disbursed $ 333,988 to Town and Country, which it deposited into its bank account at the First National Bank & Trust Company in Oklahoma City, Oklahoma. On December 28, 1971, petitioner on behalf of Town *513 and Country issued a personal check in the amount of $ 62,492 to Midwest. The $ 62,492 check bore the notation "working capital -- Town and Country." After the initial disbursement request on December 28, 1971, and continuing through April 25, 1974, Town and Country submitted monthly requests to Midwest and to the FHA for disbursement of proceeds under the guaranteed loan. The schedule below reflects disbursements requested by Town and Country and made by Midwest of loan proceeds. Also indicated is the portion of each monthly disbursement request that was described as interest due on the loan from Midwest. Total
Date of
Amount
Interest
Disbursement
Disbursed
Due
12-30-71
$   215,553.00
$    - 0 -  03-23-72
80,781.62
2,598.62
04-03-72
50,296.76
1,398.76
05-03-72
182,689.00
1,934.00
06-01-72
312,670.14
2,981.14
06-30-72
291,645.03
4,486.03
07-31-72
166,971.33
6,329.33
08-31-72
227,236.07
7,392.07
09-29-72
141,467.57
8,470.57
10-31-72
207,821.56
9,462.56
11-30-72
242,509.61
10,424.61
12-31-72
198,234.57
11,751.57
01-31-73
13,015.66
12,865.66
03-13-73
103,718.19
13,541.19
03-31-73
114,465.38
13,778.38
04-30-73
81,782.28
14,669.28
05-31-73
147,701.23
14,617.23
06-30-73
48,897.00
-0-  07-18-73
22,253.00
-0-  08-31-73
137,046.00
-0-  04-25-74
137,845.00
-0-  Total
$ 3,124,600.00
$ 136,701.00
*514 On or about December 15, 1972, petitioner sold most of his interest in Town and Country (retaining a one-percent interest therein) to a group of four newly admitted limited partners, hereinafter collectively referred to as the "Wolf group." Under the amended limited partnership agreement, the Wolf group was obligated to contribute additional capital to the partnership in the total amount of $ 330,000. Of that amount, $ 66,000 was to be paid to the partnership on December 15, 1972, and $ 67,00 was to be paid to the partnership on December 15, 1973. The remaining $ 197,000 was to be paid over the subsequent five years. Under the amended limited partnership agreement, American Urban Corp., one of the original general partners, was entitled to withdraw the full amount of the $ 330,000 in newly contributed capital as compensation for its supervision of the project. In addition, under the amended limited partnership agreement, the new limited partners were obligated to pay rent-up fees in the total amount of $ 16,000 in 1972 and $ 16,000 in 1973 to American Housing Resources, Inc., a company that was affiliated with and controlled by Hawn, the partnership's managing general partner.
*515 Construction of the apartment project continued through the spring and summer of 1973. The first building to be completed was Building 3, for which the partnership obtained an occupancy permit from the City of Oklahoma City on January 29, 1973. Before any part of the project could be occupied, however, the partnership also was required to obtain a certificate of occupancy from HUD. The partnership requested an inspection of Building 3 by HUD on January 31, 1973. HUD representatives inspected Building 3 on February 3, 1973, and determined it was not ready for occupancy. As of February 28, 1973, the partnership had received $ 615 in security deposits from prospective tenants of the apartments, but no rental income had been received (even though the partnership reported $ 5 in rental income on its 1972 return). Subsequently, on March 21, 1973, HUD issued certificates of occupancy for Buildings 1, 2, 3, 4, 5, and 6. The project was entirely completed by September of 1973, at a cost of $ 2,885,381. Town and Country timely filed Federal partnership returns (Forms 1065) for 1971, 1972, and 1973, and an amended return for 1971. On those returns, Town and Country reported net operating *516 losses of $ 229,346, $ 296,324, and $ 412,124, for 1972, 1972, and 1973, respectively. Town and Country's net operating losses flowed from various deductions reported on those returns, a number of which respondent disallowed in his statutory notice of deficiency. After concessions by both parties, the deductions claimed on the partnership returns that remain at issue herein are set forth below: Item
1971
1972
1973
Interest
--  $ 55,477
$ 62,772
Interim Financing Fee
$ 62,492
--  --  Commitment Fee
118,435
--  --  Supervisory Fees
60,000
66,000
67,000
Rent-Up Fees
--  16,000
16,000
Rental Expenses
--  --  17,095
Miscellaneous Fees
1,500
--  --  Depreciation
--  158,478
296,165
By amended petition, petitioner also claims a 1971 deduction for an additional loan commitment fee in the amount of $ 121,680 that was not reported on either the partnership's original or amended returns for 1971. OPINION
Interest -- $ 55,477 (1972) and $ 62,772 (1973)
Section 163(a)[4] allows a deduction for interest *517 actually paid or incurred on genuine indebtedness. Estate of Franklin v. commissioner,64 T.C. 752, 761 (1975), affd. 554 F.2d 1045 (9th Circ. 1976). Payment of interest by a cash basis taxpayer such as Town and Country must be made in cash or its equivalent. Helvering v. Price,309 U.S. 409 (1940): Eckert v. Burnet,283 U.S. 140 (1931). In determining whether interest has been paid in cash or its equivalent, the substance of the transaction governs over the form thereof. Battelstein v. Internal Revenue Service,631 F.2d 1182, 1184 (5th Cir. 1980) (en banc), cert. denied 451 U.S. 938 (1981); Wilderson v. Commissioner,655 F.2d 980, 982 (9th Cir. 1981), revg. and remanding 70 T.C. 240 (1978). [4]
Payment of *518 interest in cash or its equivalent does not occur where interest is withheld from loan proceeds by a lender to whom the interest is due, Heyman v. Commissioner,70 T.C. 482, 485-486 (1978), affd. 652 F.2d 598 (6th Cir. 1980), or where an interest payment is withheld by a lender from a subsequent loan, Keith v. Commissioner,139 F.2d 596, 597 (2d Cir. 1944). Additionally, interest is not considered to have been paid in cash or its equivalent (1) where the debtor issues a promissory note to the lender representing interest due, Don E. Williams Co. v. Commissioner,429 U.S. 569, 578-579 (1977); (2) where interest is paid by way of an increase in the principal of the original loan, England v. Commissioner,34 T.C. 617, 621 (1960); or (3) where interest is paid by the debtor out of funds only temporarily transferred to the debtor by the creditor. Rubnitz v. Commissioner,67 T.C. 621, 629 (1977). In Battelstein v. Internal Revenue Service, supra, the taxpayer issued periodic checks in payment of interest, but simultaneously therewith, the creditor issued checks in *519 identical amounts to the taxpayer as additional loans. The Fifth Circuit held that the arrangement merely constituted the taxpayer's promise to pay interest in future. Battelstein v. Internal Revenue Service, supra at 1184-1185. In Blitzer v. United States,231 Ct. Cl 236, 684 F.2d 874, 885-886 (1982), the Fifth Circuit's holding in Battelstein was discussed as follows: Under the Battelstein rationale a debtor is not recognized as having paid interest on a loan if he borrowed an equivalent sum from the creditor in a transaction closely linked to the payment of the interest, irrespective of the sequence. And it does not matter whether or not the borrower initially had funds of his own upon which he drew for the payment, nor whether or not he was given unrestricted control of the funds he received. * * * Under the rule applied in Battelstein the partnership's issuance of its check for the additional interest may not be deemed a payment thereof because the payee simultaneously advanced an equivalent sum to the payor for the same purpose. *520 See also Wilkerson v. Commissioner,655 F.2d at 983. The monthly interest payments in question in this case clearly can be traced to the loan proceeds received each month from Midwest. All expenses incurred by Town and Country during construction of the project, including interest due Midwest, were itemized on Town and Country's monthly requests for disbursement of loan proceeds. Pursuant to such requests, Midwest disbursed to Town and Country loan proceeds that were deposited in Town and Country's bank account. Town and Country thereafter issued checks to pay the specific expenses for which the loan proceeds were disbursed, including payments of interest to Midwest. Thus, all of the interest payments made to Midwest by Town and Country during 1972 and 1973 with respect to the $ 1,324,600 loan are directly linked to loan proceeds received from Midwest. As the Ninth Circuit stated in Wilkerson v. Commissioner,655 F.2d at 983 -- The taxpayers specifically earmarked a portion of the loan proceeds as intended for the purpose of paying the interest due. They made no showing that they had any other funds available with which to pay the interest. *521 The fact that the loan proceeds were run through the taxpayers' bank account in a transaction intended to take not more than one business day, does not affect the substance of the transaction. . . . [Citation omitted.] We hold that Town and Country's issuance of checks to Midwest does not constitute payment of interest because, Town and Country simultaneously advanced equal sums to Town and Country for that purpose. [5]
Interim Financing Fee -- $ 62,492 91971)
Town and Country claims an interest expense deduction under section 163(a) for the $ 62,492 interim financing fee paid to Midwest. Respondent claims that the fee was a service charge by Midwest for personal services rendered in connection with the $ 1,324,600 loan, and that it must be capitalized by Town and Country and amortized over the 40-year life of the loan. Alternatively, respondent contends that the $ 62,492 payment constituted *522 an interest charge paid to the lender out of loan proceeds and is nondeductible based on the authorities set forth in our discussion of the prior issue. We concluded that the $ 62,492 interim financing fee, in substance, was an interest payment. Although a number of documents refer to the $ 62,492 payment as a service charge, we consider the designation by Midwest in the loan closing document of the $ 62,492 as a two-percent financing fee to be highly indicative of the nature of this payment. We also note that one of respondent's witnesses, a HUD employee, testified generally that he understood the fee to be a "service charge," but then he explained that the service for which the charge was made was "the service of providing a loan," and that it was a fee for "providing the loan." These explanations support the characterization of the $ 62,492 payment as interest, not as a payment for personal services. In discussing a similar two-percent fee charged under an FHA-guaranteed loan program, the Court of Claims in Blitzer v. United States, supra at 881, provided the following explanation: A former HUD official, who had served both as an assistant secretary of the department *523 and as Federal Housing Authority commissioner, also testified that it was generally understood both by HUD officials and mortgage insurance applicants that the "Initial Service Charge" was used as a device for raising the yield on regulated interest rate construction loans to market level.
Based on the limited facts before us on this issue, the above explanation also is applicable to the $ 62,492 interim financing fee. See also Wilkerson v. Commissioner,70 T.C. 240, 252-256 (1978), revd. and remanded on other grounds 655 F.2d 980 (9th cir. 1981). As stated, respondent alternatively argues that the $ 62,492 interim financing fee was paid by Midwest out of loan proceeds and therefore is not currently deductible as interest. The loan documents in evidence, however, demonstrate that of the initial $ 333,988 disbursement to Town and Country, $ 118,435 was funded by capital contributions of Town and Country's limited partners, not by loan proceeds, and that such contributions were deposited into Town and Country's escrow account. Without explanation or authority, respondent asserts that the $ 62,492 financing fee must be considered to have been paid *524 out of the $ 215,543 loan proceeds Town and Country received from Midwest, rather than from Town and Country's capital (namely, the $ 118,435). Respondent does not suggest how the $ 118,435 in partnership capital should be allocated among the expenditures listed on the initial disbursement schedule. We discern no reason, and respondent has suggested none, why Town and Country should not be allowed to allocate $ 62,492 of its funds to the $ 62,492 interim financing fee. There is no evidence Town and Country ever made a different, more specific allocation of its $ 118,435. For the reasons set forth above, the $ 62,492 interim financing fee will be treated as interest and as paid by Town and Country in 1971 from its own funds, not from loan proceeds received from Midwest. As such, the fee is deductible in 1971.
Commitment Fee -- $ 118,435 (1971)
The facts relating to the nature and payment of the deduction claimed for a $ 118,435 commitment fee are sketchy and confusing. Town and Country did not claim the deduction on its original 1971 partnership return, but it did claim a deduction in the amount of $ 118,435 as a "discount on permanent financing" on its amended return *525 for 1971. Petitioner refers to this item sometimes as a "commitment fee," sometimes as a "discount." The record before us does not establish that any such fee was paid. Petitioner relies on a $ 118,435 check Town and Country issued to Midwest on December 30, 1971. As previously discussed, however, that check reflects Town and Country's deposit of partnership capital into the escrow account at Midwest. The $ 118,435 was returned to Town and Country and apparently was used (along with the initial disbursement of loan proceeds) for the items enumerated in its initial request for disbursement of loan proceeds. There is no credible evidence that a second $ 118,435 was paid by Town and Country or by petitioner on behalf of Town and Country either as a loan commitment fee or as a discount fee. We sustain respondent on this adjustment.
Loan Commitment Fee -- $ 121,680 (1971)
The $ 121,680 deduction now claimed by petitioner as a loan commitment fee or as an additional financing point on the loan was not claimed on Town and Country's original or amended partnership returns for 1971. Upon determining before trial that on December 27, 1971, petitioner on behalf of Town and *526 Country had paid Midwest $ 121,680, petitioner moved to amend his petition to claim the payment as a deductible loan point or commitment fee of Town and Country. Respondent claims that the payment was not made by petitioner or behalf of the partnership, and that if it was so made, it should be regarded as interest and deducted over the life of the loan to avoid an improper distortion in the 1971 taxable income of Town and Country. The evidence before us establishes that petitioner did make a $ 121,680 payment on December 27, 1971, to Midwest on behalf of Town and Country. Although the evidence as to the nature of this payment is not completely clear, the record is sufficient to establish that this payment constituted an additional point or financing fee relating to the loan obtained from Midwest, and deductible generally as interest under section 163(a). Apparently, Atkinson originally agreed to pay this financing fee, and Town and Country became obligated with respect thereto when it purchased Atkinson's interest in the project and obtained the rights to the FHA guarantee and to the Midwest loan. This $ 121,680 fee was in addition to the $ 62,492 interim financing fee, previously *527 discussed herein, that Town and Country also was obligated to pay. Respondent makes the alternative argument that a current interest deduction for the $ 121,680 financing fee should not be allowed in order to avoid an improper distortion in Town and Country's taxable income for 1971. Interest deductions under section 163 must be read in light of sections 446(b) and 461.[6]Baird v. Commissioner,68 T.C. 115, 130 (1977). Generally, a cash basis taxpayer may deduct interest in the year paid unless the deduction would cause a material distortion of income, and the Commissioner has broad authority to determine whether a method of accounting as to particular items of income and expense cause a material distortion of income. American Automobile Association v. United States,367 U.S. 687, 697-698 (1961); Baird v. Commissioner, supra at 131. *528 On the facts of this case, we must reject respondent's mere assertion that an improper distortion of Town and Country's 1971 taxable income will occur if the $ 121,680 is allowed as a current deduction. Respondent ignores the fact that he has disallowed (and petitioner has conceded) approximately $ 58,000 of the interest deductions claimed on Town and Country's amended 1971 tax return. Furthermore, we are disallowing herein an additional $ 119,935 in claimed interest deductions [7] and $ 60,000 in claimed supervisory fees (as discussed infra). Supervisory Fees -- $ 60,000 (1971), $ 66,000 (1972), and $ 67,000 (1973)
Town and Country deducted "supervisory fees" in the amounts of $ 60,000, $ 66,000, and $ 67,000 on its respective 1971, 1972, and 1973 Federal income tax returns. Courts previously have held that supervisory fees incurred in the organization of a partnership, the acquisition or construction of apartment units (including the supervision of general contractors), and in obtaining FHA approval of long-term *529 financing and insurance are capital expenditures. Blitzer v. United States, supra at 893-895; Goodwin v. Commissioner,75 T.C. 424, 440-441 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982); see also Cagle v. Commissioner,539 F.2d 409, 416 (5th Cir. 1976), affg. 63 T.C. 86 (1974). Respondent alleges that petitioner has not adequately established that any supervisory fees actually were paid by Town and Country and, if paid, that petitioner has not established the nature of such fees. Petitioner argues that the supervisory fees incurred by Town and Country related solely to the ongoing management and operations of the partnership, and that they are currently deductible under section 162. He alleges that on December 30, 1971, on behalf of the partnership he paid Atkinson the $ 60,000 supervisory fees due for 1971 for Atkinson's services in "administering and managing the partnership's affairs." With respect to the deductions claimed for supervisory fees for 1972 and 1973, petitioner alleges that Town and Country's general partner American Urban Corp., paid the supervisory fees to Atkinson out *530 of the capital contributions that Town and Country received in those years (namely, the $ 66,000 and $ 67,000). The record establishes payment of $ 60,000 to Atkinson in 1971. We agree with respondent, however, that such payment cannot be construed as a payment of supervisory fees. The sales agreement between petitioner and Atkinson states explicitly that that payment of $ 60,000 to Atkinson was part of the sales price of the land, not supervisory fees of any kind. The record herein provides no credible evidence that any of the claimed supervisory fees actually were paid. Although the second amended limited partnership agreement authorized payments of supervisory fees out of additional capital contributions, there is no documentation establishing that the additional capital funds ever were received by the partnership in 1972 and 1973. Indeed, one of the general partners testified that additional capital was contributed by means of promissory notes, not cash. Furthermore, no partnership checks showing payment of such amounts were offered into evidence. We simply are unable to find adequate support in the record for the deductions claimed for supervisory fees. Also, other *531 than general testimony, it is not apparent from the record that Atkinson performed any responsibilities during construction of the project beyond those which typically would be performed by a general contractor in constructing the apartments. We sustain respondent on this issue for each of the years 1971, 1972, and 1973.
Rent-Up Fees -- $ 16,000 (1972) and $ 16,000 (1973)
Petitioner contends that Town and Country paid fees or commissions relating to services for the rental of the apartment units in 1972 and 1973 in the amounts claimed on the tax returns. Additionally, petitioner on brief claims an additional deduction of $ 16,000 for rent-up fees in 1973. Respondent contends that the evidence does not establish the payment of any such fees. With regard to the $ 16,000 rent-up fee claimed in 1972, we agree with respondent. The second amended limited partnership agreement indicates that Town and Country was to pay $ 16,000 as a rent-up fee on December 15, 1972, and another $ 16,000 on December 15, 1973. Due to the loss of partnership records, however, petitioner is unable to document what actually was paid as rent-up fees in this year. Petitioner's witnesses testified *532 generally as to the payment of these fees. In light of the fact that no apartment units were completed until March or April of 1973, it is difficult to believe that Town and Country would have paid rent-up fees to anyone in 1972. The apartment units apparently were to be rented on short-term leases and generally the rental of such units would not occur until construction of the units was completed and the units were available for occupancy. Without corroborating documentation, we are not persuaded that Town and Country actually paid rent-up fees or commissions in 1972. We sustain respondent's disallowance of this deduction for 1972. In 1973, however, we think it obvious that Town and Country paid substantial rent-up fees or commissions. Many of the apartment units owned by Town and Country were completed and rented in 1973. American Housing Resources, under the second amended limited partnership agreement, was to perform and was entitled to receive payment for such services in 1973. American Housing Resources or other real estate agents must have solicited tenants, processed applications, and finalized leases in 1973 on behalf of Town and Country. The $ 17,095 claimed on *533 the partnership return ties in closely to the amount Town and Country was obligated to pay under the referred-to agreement (namely, $ 16,000), and the trial testimony supports the conclusion that such fees were paid. We conclude that Town and Country paid rent-up fees or commissions in 1973 in the amount of $ 17,095. Such amount is deductible in 1973 since the underlying leases were short-term leases. Sec. 1.461-1(a)(1), Income Tax Regs.[8]
The additional $ 16,000 rent-up fee that petitioner alleges was paid by Town and Country in 1973 is disallowed on the ground that the payment of such item is completely unsubstantiated. It also is disallowed on the ground that petitioner failed to amend his petition to raise this issue and, as such, it is not properly before us. Rule 41; Parrish & Co. v. Commissioner,3 T.C. 119, 129 (1944), *534 affd. 147 F.2d 284 (5th Cir. 1945).
Depreciation -- $ 158,478 (1972) and $ 296,165 (1973)
Town and Country claimed depreciation on its 1972 tax return with respect to all 26 buildings in the project. Respondent has disallowed all depreciation claimed in 1972 on the ground that none of the buildings was placed in service until 1973. Section 167(a)[9] provides an allowance for depreciation for exhaustion and wear and tear (including obsolescence) of property used in a trade or business or held for the production of income. The period for depreciation begins when the asset is "placed in service." Sec. 1.167(a)-10(b), Income Tax Regs. An asset is first placed in service when it is placed "in a condition or state of readiness and availability for a specifically assigned function * * *." Sec. 1.167(a)-11(e)(1)(i), Income Tax Regs.[10]
*535 With respect to rental property, a building is considered to be placed in service when it is available for occupancy, even though it may not actually be rented. Blitzer v. United States, supra at 894. In Blitzer, the Court of Claims determined that the apartment units built by the taxpayer were not "placed in service" within the meaning of section 1.167(a)-11(e)(1)(i), Income Tax Regs., until municipal officials had issued certificates of occupancy with respect thereto. Blitzer v. United States, supra at 894. Petitioner contends that one of the apartment buildings in the project (namely, Building 3) was substantially completed and was available for occupancy in December of 1972, and that, therefore, we should consider the entire project as being placed in service as of December of 1972. Petitioner argues that the project was substantially completed before March 21, 1973, and that the date on which occupancy permits were issued with respect to the apartments is not dispositive of the date on which the apartment project was first placed in *536 service for purposes of section 167. The evidence demonstrates that none of the apartments within any of the 26 apartment buildings was ready and available for occupancy at the close of 1972. The inspection reports with respect to the project indicate that as of February of 1973, many of the apartments still lacked items which generally are considered necessary for occupancy, such as kitchen ranges, refrigerators, bathroom fixtures, doors, carpeting, and electrical fixtures. We agree with respondent that under section 1.167(a)-11(e)(1)(i), Income Tax Regs., no portion of the apartment project was placed in service before March 21, 1973. We sustain respondent on this issue.
Miscellaneous Fees -- $ 1,500 (1971)
On its 1971 Federal partnership return, Town and Country deducted $ 1,500 for miscellaneous fees paid in 1971. Respondent argues, and we agree, that no deduction is allowable for such fees, even though actually paid, because petitioner has presented no evidence as to the nature of the fees or the reasons for which they were incurred. Due to the severance of other issues raised in the petition herein, An appropriate order *537 will be entered.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. The record does not explain why the entire $ 124,987 in points was not paid. ↩
3. National Housing Act, ch. 847, tit. II, sec. 207, 48-1 Stat. 1242 (1934), 12 U.S.C. secs. 1713 and 1715(b)↩. 4. Sec. 163(a) provides: (a) General Rule -- There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness. ↩
5. Respondent does not dispute that deductions for the interest disallowed herein will be allowed in later years as Town and Country pays off the loan. See Heyman v. Commissioner,70 T.C. 482, 485 (1972), affd. 652 F.2d 598↩ (6th cir. 1980).
6. SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING. (b) Exceptions. -- If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income. SEC. 461. GENERAL RULE FOR TAXABLE YEAR OF DEDUCTION. (a) General Rule. -- The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income. ↩
7. The $ 119,935 in interest deductions that are disallowed herein consists of the $ 118,435 claimed commitment fees and $ 1,500 in miscellaneous fees.↩
8. We express no opinion as to this Court's acceptance of the Ninth Circuit's interpretation of the one-year rule of sec. 1.461-1(a)(1), Income Tax Regs. See Zaninovich v. Commissioner,616 F.2d 429 (9th Cir. 1980), revg. 69 T.C. 605↩ (1978). 9. Sec. 167(a) provides: (a) General Rule. -- There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) -- (1) of property used in the trade or business, or (2) of property held for the production of income. ↩
10. Sec. 1.167(a)-11(e)(1)(i), Income Tax Regs., provides in relevant part: (e) Accounting for eligible property -- (1) Definition of first placed in service -- (i) In general. The term "first placed in service" refers to the time the property is first placed in service by the taxpayer, not to the first time the property is placed in service. Property is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity. * * * ↩